Heather LADISH, Appellant,

v.

**Stephen M. GORDON, D.O., Respondent.**

**No. WD 46715.**

Missouri Court of Appeals,
Western District.

Submitted March 29, 1994.

Decided May 17, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 28, 1994.

Application to Transfer Denied
Aug. 15, 1994.

---

5. There is no claim here that defendant might be liable both in tort and contract.

J. Scott Bertram, Law Offices of J. Scott Bertram, Kansas City, for appellant.

J. Michael Shaffer, McDowell, Rice & Smith, Kansas City, for respondent.

Before ULRICH, P.J., and BERREY and SMART, JJ.

SMART, Judge.

This case involves a physician's treatment of the plaintiff's condition of genital warts. A jury awarded plaintiff $75,000.00 for pain and suffering on her claim of negligence. The trial court granted defendant's motion for judgment notwithstanding the verdict. Plaintiff Ladish appeals the trial court's judgment granting defendant's motion for judgment notwithstanding the verdict.

On November 18, 1987, Heather Ladish sought medical treatment from Dr. Stephen Gordon for condyloma, commonly known as genital warts. Plaintiff had earlier seen another physician for this condition, and had been provided a topical cream designed to eradicate the warts. However, plaintiff's warts had spread despite the use of the cream. Plaintiff's sister, who was consulting Dr. Gordon about another matter, informed Dr. Gordon of plaintiff's circumstances. Dr. Gordon recommended that plaintiff see him right away, which she did.

In the examination on November 18, Dr. Gordon explained to plaintiff that the warts, which are usually transmitted by sexual contact, are potentially quite dangerous because they are precancerous. Because plaintiff's cervix was also affected by the warts, Dr. Gordon wanted to perform a biopsy of the cervix before deciding on the precise plan of treatment for the warts. Dr. Gordon indicated he anticipated using laser surgery to remove the warts on the vulva. He explained that recovering from laser surgery can be quite painful. He advised plaintiff that he wanted her to be prepared following the laser surgery to administer suppositories in her vagina, and to apply a cream to the inside and outside of the labial lips. He said that he also wanted her to soak in sitz baths as an aid to her recovery. He also indicated that, several weeks after surgery, he would prescribe the use of a topical substance called Efudex, which contains a chemotherapy agent. Dr. Gordon told her the Efudex also causes a painful burning sensation. Dr. Gordon advised her that treatments to remove warts are not always successful in permanently eradicating the warts, and that for some people the warts chronically recur.

Dr. Gordon instructed Ms. Ladish to have the sitz bath equipment, the suppositories, and the medicated cream on hand at the time of the surgery so she would be prepared for the recuperation process upon her return home following the outpatient surgery. He indicated he would plan to see her two weeks after the laser surgery, and that he anticipated implementing the use of the Efudex cream at that time. Her appointment was set for November 24 to review the results of the biopsy, and to schedule the outpatient laser surgery and any other procedures.

On November 24, Ms. Ladish conferred with Dr. Gordon by telephone, and learned that Dr. Gordon would use the laser surgery for the cervix as well as the vulva. The surgery was scheduled for December 28, 1987. Ms. Ladish was concerned that the surgery was not scheduled sooner, but she did not demand an explanation for the delay.

The surgery was conducted on December 28 as scheduled. The laser surgery was quite extensive because the warts had continued to spread during the intervening period. Following the operation, Ms. Ladish experienced a great deal of pain and discomfort. She also experienced a vast amount of swell-

ing of her genital area. After being contacted by Ms. Ladish's mother on January 2, 1988, who insisted that Dr. Gordon see Ms. Ladish immediately, Dr. Gordon met Ms. Ladish at the emergency room. Ms. Ladish had an extremely bad case of swelling. Dr. Gordon administered a steroid injection to Ms. Ladish in an effort to reduce the swelling of the tissues. Dr. Gordon also observed that there was an adherence of the labial lips which required separation. Using his finger, Dr. Gordon separated the labial lips. According to Ms. Ladish, the pain she experienced at that moment was the worst pain she had ever experienced in her life. The procedure took two or three seconds.

On January 11, 1988, Dr. Gordon again physically examined Heather Ladish. At this time, although Ms. Ladish was still experiencing some pain and swelling in her genital area, the intensity of both had decreased substantially. During this visit, Dr. Gordon prescribed Efudex. Upon applying the Efudex, Ms. Ladish again experienced severe burning and inflammation. Being dissatisfied with Dr. Gordon's treatment, Ms. Ladish sought an evaluation with another physician. In April, 1988, her new physician performed a second laser procedure on Ms. Ladish, apparently because of a recurrence of the warts.

One year later, Ms. Ladish filed her petition for damages against Dr. Gordon for the negligent treatment of her condition. The case was tried in May, 1992. Plaintiff's expert appeared by way of a deposition taken several weeks earlier. Ms. Ladish's petition alleged Dr. Gordon was negligent in (1) failing to perform the procedure before December 28, 1987; (2) failing to advise plaintiff as to the importance of separating the labial lips periodically to keep the lips from adhering to one another; (3) failing to personally evaluate plaintiff's condition until five days after surgical procedure; (4) failing to administer pain medication prior to separating the labia; and (5) prescribing Efudex. No special damages were sought by plaintiff. Plaintiff

sought recovery only for increased pain and suffering which she contended resulted from negligent treatment provided by Dr. Gordon. The jury awarded Ms. Ladish $75,000.00 for her pain and suffering.

On August 13, 1992, the trial court entered an order granting Dr. Gordon's motion for judgment notwithstanding the verdict on the grounds that (1) plaintiff failed to offer testimony from a qualified expert with an understanding of the applicable standard of care; (2) there was no competent evidence to support the allegations of negligence contained in the verdict-directing instruction; and (3) there was no competent evidence to support a damage award for pain and suffering. The trial judge further ordered that if the judgment notwithstanding the verdict was reversed on appeal, then Dr. Gordon would be granted a new trial.[1] Heather Ladish appeals from the trial court's judgment.

Plaintiff argues that the trial court erred in granting defendant's motion for judgment notwithstanding the verdict because: (1) plaintiff presented a qualified medical expert and the expert's rendition of the applicable standard of care was proper; (2) plaintiff presented substantial evidence to support each allegation of negligence set forth in the verdict directing instruction; (3) plaintiff presented competent evidence of her pain and suffering to support the jury's verdict; and (4) the court did not abuse its discretion in allowing the jury as much time as was deemed necessary in which to render a verdict.

■ The first issue to be addressed in this case is whether plaintiff made a submissible case for negligence against Dr. Gordon on any theory. In determining whether plaintiff made a submissible case against defendant, this court views the evidence in the light most favorable to the plaintiff, giving plaintiff the benefit of all favorable evidence and reasonable inferences to be drawn therefrom, and this court disregards all evidence con-

1. The trial court concluded that there was instructional error since the jury submissions in the disjunctive were not supported by substantial evidence. The court also concluded that it had committed error in forcing the jury to deliberate further, and not declaring a mistrial, when the foreperson of the jury had maintained on three separate occasions that the jury was hopelessly deadlocked.

trary to plaintiff's claim. *Delisi v. St. Luke's Episcopal–Presbyterian Hosp.,* 701 S.W.2d 170, 173 (Mo.App.1985). If we conclude that the trial court was correct in finding a submissible case was not made, plaintiff's points are moot.

■ To make a prima facie negligence claim, plaintiff must prove the existence of a duty to be performed by defendant, a breach of the existing duty, and a resulting injury caused by defendant's breach of duty. *Krause v. United States Truck Co.,* 787 S.W.2d 708, 710 (Mo. banc 1990). Expert testimony generally must be introduced to establish the standard of care in a medical negligence case. *Dine v. Williams,* 830 S.W.2d 453, 456 (Mo.App.1992). In order to establish her prima facie case, Plaintiff Ladish bears the burden of proving that Dr. Gordon failed to exercise that degree of skill and learning ordinarily exercised by members of his profession under the same or similar circumstances in treating her condition. *Cebula v. Benoit,* 652 S.W.2d 304, 307 (Mo.App.1983). Additionally, plaintiff must show that defendant's negligent act or acts caused her resulting pain and suffering. *Swope v. Printz,* 468 S.W.2d 34, 39 (Mo. 1971).

Plaintiff's verdict directing instruction for her medical malpractice claim read as follows:

### Instruction No. 5

Your verdict must be for plaintiff Heather Ladish, if you believe:

First, defendant Stephen M. Gordon, D.O. either:

Scheduled the laser procedure for December 28, 1987, or

Failed to personally examine Heather Ladish after the procedure of December 28, 1987, until January 2, 1988, or

Failed to advise plaintiff Heather Ladish to separate the labial lips until January 2, 1988, or

Failed to give plaintiff Heather Ladish any pain medication in the Emergency Room before separating her labial lips on January 2, 1988, or

On January 11, 1988, prescribed Efudex to plaintiff Heather Ladish, and

Second, defendant Stephen M. Gordon, D.O., in any one or more of the respects submitted in Paragraph First, was thereby negligent, and

Third, as a direct result of such negligence plaintiff sustained damage.

■ Missouri courts have held that it is error to give an instruction where there is no substantial evidence to support the issues submitted. *Cowan v. Perryman,* 740 S.W.2d 303, 304 (Mo.App.1987); *Evinger v. McDaniel Title Co.,* 726 S.W.2d 468, 472 (Mo.App. 1987). The court in *Cowan* stated: "If the evidence presented 'leaves the causal connection in the nebulous twilight of speculation, conjecture, and surmise,' the burden is not met and the instruction should not have been given." 740 S.W.2d at 304. Furthermore, when an instruction is given in the disjunctive, there must be evidence to support the submission of each allegation. *Brown v. Shawneetown Feed and Seed Co.,* 730 S.W.2d 587, 589 (Mo.App.1987). If each allegation presented in the instruction is not supported by the evidence, and the giving of the instruction is not supported by the evidence, then the giving of the instruction is error. *Id.*

■ It is clear that Ms. Ladish had some extremely painful and unfortunate experiences in connection with the treatment of her condyloma. The question, however, is whether Plaintiff Ladish's evidence is sufficient to make a prima facie case for submission on any theory of negligence pursued. No presumption of negligence arises from an adverse result. *Swope v. Printz,* 468 S.W.2d 34, 39 (Mo.1971). We examine the evidence in connection with each theory submitted.

### Scheduling the Procedure

First, plaintiff alleged that defendant negligently scheduled her laser procedure on December 28, 1987, six weeks after Dr. Gordon diagnosed her condyloma. She contends that the delay in conducting the procedure was excessive. Plaintiff first visited Dr. Gordon on November 18 regarding plaintiff's condition. Dr. Gordon told plaintiff that she

had the genital warts on both her vulva and cervix. He then told plaintiff that laser surgery would be necessary to treat the warts on the vulva, but that a biopsy of the cervix would be required to best determine treatment for the warts found in the cervix. Another appointment was set for November 24 to discuss the biopsy results and to schedule the surgery. Plaintiff was unable to make the appointment due to severe weather conditions, so the doctor and patient discussed the matter by telephone. As a result of that conversation, surgery was scheduled for December 28.

■ To establish Dr. Gordon's alleged negligence, plaintiff presented testimony from Dr. Regis J. Weiss, a gynecologic oncologist from San Diego. When asked whether defendant's scheduling of the laser procedure fell below "accepted medical standards," plaintiff's expert, Dr. Regis J. Weiss, responded:

It is the usual approach to treating condylomata that are growing rapidly to try to treat them in a timely fashion, usually within two weeks of making the diagnosis. *There are circumstances where at times that's impossible to do.* The reasoning as I understand it in this case for the delay was waiting for her menstrual period. In six weeks' time, in a woman that is taking the birth control pill, however, there are usually two menstrual periods that would occur. In her particular case, I believe the first of those menstrual periods would have been around the 24th of November, and *it might have been more appropriate to have scheduled the procedure around that particular date.*

(Emphasis added.)

It is argued by plaintiff that the opinion of Dr. Weiss constitutes sufficient evidence to create a submissible issue as to whether Dr. Gordon's action in scheduling plaintiff's surgery on December 28, instead of sometime before, was negligent and thereby caused plaintiff to endure an increased degree of pain and suffering. Dr. Weiss testified that the usual approach was to schedule the procedure within two weeks of the diagnosis, but he admits that such ideal scheduling is not always possible. There is no indication that

Dr. Weiss considered whether, in this case, Dr. Gordon was *able* to schedule the surgery promptly. According to Dr. Weiss' testimony, the only factor which he understood Dr. Gordon considered was the menstrual period. Because he had no knowledge of other considerations affecting the scheduling of the procedure, the most that he could say was that it "might have been more appropriate" to have scheduled the surgery sooner. Nor was there evidence showing that Dr. Gordon was able to schedule the surgery sooner. Dr. Gordon's testimony did not aid plaintiff, since he testified that he was hindered in scheduling the surgery by various factors in addition to trying to work around her menstrual period. Plaintiff is not aided by any presumptions, but instead must affirmatively introduce evidence of negligence. The opinion of Dr. Weiss that it "might have been more appropriate" to have scheduled the procedure at an earlier time simply does not in this case establish a breach of the duty to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of Dr. Gordon's profession. *See Gridley v. Johnson,* 476 S.W.2d 475 (Mo.1972). The opinion of a medical expert must have sufficient probative force to constitute substantial evidence. *Pippin v. St. Joe Minerals Corp.,* 799 S.W.2d 898, 904 (Mo.App.1990). We conclude that plaintiff has failed to establish that defendant had a legal *duty* to schedule the laser surgery within two weeks of diagnosis.

### · *Post Operation Visit*

■ Next, plaintiff alleged that defendant was negligent in waiting to personally examine her after the procedure on December 28 until January 2. Plaintiff's mother called Dr. Gordon several times from December 28 to January 2, and in each case spoke · with a nurse because Dr. Gordon was not available. Each call was made to inform Dr. Gordon's office that plaintiff was in great pain. Some calls also included inquiries as to some aspect of the recovery. Her first call was to determine where the ice should be placed. Another call dealt with her daughter's constipation. Ms. Ladish did not mention the tremendous amount of swelling that Ms. Ladish was ex-

periencing until January 2, the day Dr. Gordon met plaintiff at the emergency room.

Dr. Weiss was asked to state his opinion as to whether the fact that Dr. Gordon did not see Ms. Ladish post-operatively until five days after the surgery fell below the "accepted medical standards." He stated, *"If he was aware of her problems,* I think it was beneath the standard of care to wait that long to evaluate her. *I am not entirely sure that he was aware of her problem and its degree of intensity."* (Emphasis added.) And in fact, plaintiff's evidence indicates that Dr. Gordon was not advised of the extensive swelling before January 2, at which time he met plaintiff at the emergency room. Dr. Gordon was advised of the great deal of pain plaintiff was enduring, but even plaintiff's evidence indicated severe pain is normal and expected during the initial recuperative phase of an extensive laser procedure. The testimony was that it was Dr. Gordon's usual procedure to wait two weeks after laser surgery to see a condyloma patient post-operatively. There was no evidence that this procedure was a departure from the appropriate standard of care. The evidence does not support a submission that Dr. Gordon breached any duty owed to plaintiff to see her before January 2. Plaintiff's submission of post-operative delay in treatment fails for lack of evidence.

### Separation of the Labial Lips without Medication

 Plaintiff also alleged that Dr. Gordon was negligent in failing to give plaintiff any pain medication in the emergency room before separating her labial lips, which had become adherent during her recuperation period. Dr. Gordon used his finger to physically separate the labial lips. The procedure took two or three seconds. Dr. Weiss responded to the question of whether Dr. Gordon's action fell beneath the "accepted standards of care" as follows:

> In view of what was described as far as the degree of swelling and the amount of discomfort that necessitated her visiting him in the emergency room, I would think that, if he knew that he had to separate the labia, under those circumstances *it*

*would be appropriate* to give her intravenous sedation and possibly some topical anesthetic to make the procedure less uncomfortable.

(Emphasis added.) Although Dr. Weiss asserted that a topical anesthetic and intravenous sedation would be appropriate, he did not testify that Dr. Gordon's conduct constituted a deviation from the appropriate standard of care, which is the degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession. A medical doctor is entitled to a wide range of discretion in the exercise of judgment and a doctor will not be found negligent unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally. *See Williams v. Chamberlain*, 316 S.W.2d 505, 510 (Mo.1958). We have found no precedent for allowing recovery based upon the failure of a physician to use anesthesia or sedation in connection with a two-or-three-second procedure, where recovery is sought solely for the pain suffered during the procedure. Here there is no claim that Dr. Gordon had no permission to proceed to separate the labial lips. The claim is merely that he had a duty to take some action to mitigate the pain. It seems likely that individual variations in judgment about such matters will be commonplace. It is common knowledge that the use of medications for pain may introduce factors of cost and additional risk of complication which would not be present otherwise. Nevertheless, assuming without deciding that a claim based on failure to give pain medication may in some circumstances be legally cognizable, plaintiff has not in this case shown that there was a legal duty to administer pain medication. Dr. Weiss' opinion that "it would be appropriate" to use medication simply is not sufficient to establish a duty. Dr. Gordon cannot be held liable except for failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession. *Williams*, 316 S.W.2d at 510. Plaintiff has failed to establish that Dr. Gordon had a legal duty to do other than what he did.

*Efudex*

Plaintiff also submitted to the jury the allegation that defendant was negligent in prescribing Efudex for plaintiff on January 11, 1988. This was based on the allegation of the petition that defendant was negligent "in prescribing Efudex."

Plaintiff testified that she obtained the Efudex on January 16, 1988, and first applied it externally January 18 or 19. She does not recall whether, the first time she applied it, she experienced any burning sensation. The second time she applied it was about a week later which was approximately a month after the laser surgery. This time she noticed a "little bit of burning sensation." She used it a third time in early February. This time, she said, "it burned me bad." She said it was "very, very uncomfortable." She saw Dr. Gordon for her previously scheduled appointment on February 8. By this time she had decided she had a yeast infection. The doctor confirmed that she had a yeast infection. He told her to discontinue the Efudex for a week while she used Mycelex for the yeast infection. He told her that, after using the Mycelex for about a week, she could go back on the Efudex. She testified that when she resumed using the Efudex, she was very, very burned—so burned she could not urinate. She said she was experiencing pain which was almost worse than the laser surgery. At that time she did not consult Dr. Gordon further. She decided to go see another physician, who prescribed some topical creams. Several days later she was admitted to the hospital because she was in such severe pain she could not urinate. She was diagnosed as having an acute vulvitis (inflammation of the vulva).

■ Plaintiff again relies upon Dr. Weiss' opinion of Dr. Gordon's actions. When asked whether prescribing Efudex after laser surgery fell below "accepted medical standards," Dr. Weiss responded: "I don't believe so, in that it has been described as an acceptable technique, and there are a number of people throughout the country that do use it as a combination technique." He went on to say, however, that he thought it showed "poor judgment" to prescribe Efudex relatively soon following the laser procedure, while plaintiff was still healing, because of increased discomfort which would be experienced by plaintiff.

In view of the evidence, the jury submission (that Dr. Gordon was negligent in prescribing Efudex on January 11, 1988) presents some problems. The first is the fact that the hypothesis that it was negligent to prescribe Efudex was not supported by substantial evidence. The petition alleged the negligent act was the act of prescribing Efudex. Yet all of the medical evidence, including Dr. Weiss' testimony, was that it was not a violation of any duty to prescribe Efudex as a follow up to laser surgery for genital warts. The evidence showed that the use of Efudex, in fact, is beneficial in that it may obviate the need for further laser surgery later.

The case was pleaded and prepared for trial on the theory that the mere prescription of the Efudex was negligent. The submission was based upon the wording of the petition. We conclude that the particular submission invited the jury to find Dr. Gordon negligent simply because he prescribed Efudex, a proposition for which there was no evidentiary support.

■ Even if, however, we were to construe the submission as submitting to the jury the proposition that it was negligent to prescribe Efudex at that particular time in view of plaintiff's particular circumstances,[2]

---

**2.** If what plaintiff intended in her submission was to submit the issue of whether, under the unusual and particular circumstances of this case, it was negligent to prescribe Efudex *at the time* it was prescribed, plaintiff has another problem in that the submission does not describe *how* Dr. Gordon was allegedly negligent in prescribing Efudex. In *Ballew v. Schlotzhauer,* 492 S.W.2d 774 (Mo.1973), plaintiff submitted an instruction which authorized a verdict for defendant if the jury found that plaintiff rode "upon an open truck bed," and that in doing so plaintiff

was negligent. The court found no basis in that case upon which the jury could find that riding upon the open bed vehicle was a sufficient predicate for a finding of contributory negligence, because the real contention was that *under certain attendant circumstances*, riding on the open truck bed was negligent. The court held the instruction was improper because it authorized the jury to find contributory negligence based solely on the fact that plaintiff rode on an open truck bed. Such submissions invite jurors to

plaintiff's medical evidence still falls short of establishing a breach of duty by Dr. Gordon. Dr. Gordon's duty is only to use the degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession. *Gridley v. Johnson,* 476 S.W.2d 475 (Mo.1972). Matters of judgment, including issues such as the point at which it would be appropriate to prescribe Efudex, are generally not subject to liability determinations. *Williams v. Chamberlin,* 316 S.W.2d 505, 510 (Mo.1958). In this case, Dr. Gordon examined the plaintiff two weeks after the surgery and nine days after he had dealt with her extreme swelling. His office records of that examination show that the areas affected by the laser surgery were doing well and were healing nicely. The records do not reveal significant discomfort by plaintiff at that time. Dr. Weiss felt it was "foolish" to put her on the Efudex at the time he did in view of what he believed to be her reaction to the laser surgery.[3] Dr. Weiss did not, however, take issue with assertions from authoritative medical literature which were entirely consistent with Dr. Gordon's plan to follow up laser surgery with Efudex shortly thereafter. Dr. Weiss, confronted with these articles, retreated to the notion that "for the most part ... most people would use [Efudex] when epithelialization has occurred—that is, when healing is complete." He then admitted that the literature indicates that, "you can get away with using it before epithelialization has occurred." He also stated he did not disagree with the statement of one physician he acknowledged to be authoritative that in order for Efudex to be beneficial in retarding recurrence of the virus, the drug should be applied early (within four weeks) of the surgical removal of the warts. He also stated he did *not* disagree with the statement that Efudex can be applied "immediately after surgical removal" of the warts.

Dr. Weiss was specifically asked whether it was proper for Dr. Gordon to prescribe Efu-

dex as he did in this case "when healing has not occurred." Dr. Weiss commented, "in general, I think it's an acceptable technique, in the hands of experienced people." The implication, of course, was that Dr. Gordon was not experienced. There was, however, no evidence that Dr. Gordon was not experienced. Dr. Gordon testified he had previous experience in the treatment of genital warts, including laser surgery. Nor was there any explanation as to precisely how lack of experience would be a problem. The cross-examination completely negated Dr. Weiss' opinion on direct examination that it is "beneath the standard of care" to apply Efudex to the vulva "after laser surgery and before healing." The long and short of it is that, no matter how it is sliced, Dr. Weiss' testimony at most amounts to an expression of his own practices, and did not establish a prima facie case of breach of duty. The circumstances here may be considered within the ambit of the apt remarks of Judge Cox in *Bailey v. St. Louis–San Francisco Ry. Co.,* 296 S.W. 477, 479 (Mo.App.1927):

> Physicians and surgeons must be allowed a wide range in the exercise of their judgment and discretion. The science of medicine is not an exact science. In many instances there can be no fixed rule by which to determine the duty of a physician, but he must often use his own best judgment and act accordingly. By reason of that fact the law will not hold a physician guilty of negligence as long as he uses his best judgment, even though his judgment may prove erroneous in a given case, unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally. As long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken.

There was no evidence that this conclusion was unreasonable, and there was no evidence (and only hindsight speculation by Dr. Weiss) that the swelling should have alerted Dr. Gordon to the idea that plaintiff may be particularly susceptible to a reaction to the Efudex.

find negligence where none has been shown by the evidence.

**3.** Dr. Gordon had concluded that the extreme swelling plaintiff had endured following the surgery was due to the fact that plaintiff had taken sitz baths in hot water rather than cool water.

This allegation of negligence was not submissible and the trial court properly found this submission not supported by the evidence.

### Failure to Advise Concerning Separation of the Labial Lips

Plaintiff also contends that Dr. Gordon negligently failed to advise plaintiff to separate the labial lips several times each day after surgery. After a laser procedure is performed in the genital area the labial lips are raw and may become adherent. Plaintiff claims she did not know she was to separate the labial lips, and if she had been properly instructed, she would have periodically separated the lips so that they would not have become adherent.

Dr. Weiss testified that it was his opinion that if Dr. Gordon had failed to instruct plaintiff about the importance of separating the labial lips, that his omission fell below the "standard of care." Dr. Gordon testified that it is part of his normal routine to advise patients to periodically separate the labial lips to keep them from becoming adherent. He could not recall specifically advising plaintiff or her parents about it in this case, but he is confident he did so advise her.

■ Plaintiff and her mother acknowledged that Dr. Gordon prescribed the use of suppositories and a cream following the laser procedure. Although the suppositories were not very large and the insertion of the suppositories would not necessarily have required the separation of the entire length of the labial lips, the administration of the cream to both the inside and outside of the lips as instructed presumably would have tended to cause a separation of the labial lips. Plaintiff contends that her mother and her grandmother applied the cream as they had been directed, but she suggests that the cream could have been applied to both the inside and the outside of the lips without separating the lips. The acknowledgement of plaintiff's mother that they gave up on trying to deposit the suppositories because plaintiff "couldn't bear to be touched" seems to undermine plaintiff's contention that the cream was regularly applied several times a day. Nevertheless, we construe the evidence in the light most favorable to the verdict for purpose of evaluating whether plaintiff made a submissible case. Plaintiff testified that the cream was regularly applied, and that in spite of the fact that the cream was applied, the lips still adhered.

■ We are tempted to assume that regular application of the cream would necessarily require sufficient separation of the labial lips to prevent adherence. Dr. Weiss' testimony does not address this issue. The testimony of Dr. Calkins, defendant's expert, is that application of the cream would result in sufficient separation of the labial lips. Dr. Gordon, in testifying about the importance of separating the labial lips, stated:

> You can do this [separation of the labial lips] a lot of different ways. You could actually do this when applying the cream externally, and that's probably the easiest way to do it, and it's just something that every time you are attending to the vulva should be done.

Defendant suggests that the act of prescribing the application of the cream necessarily takes care of the need to advise concerning separation of the lips. We note, however, that there is a distinction between application of the cream and a specific effort to separate the labial lips. We cannot conclude that advising the patient on the use of the cream and the suppositories would necessarily constitute the same thing as specifically advising of the risk of adherence and the need to regularly separate the labial lips. Also, while plaintiff acknowledged in her testimony that she would have had to separate the labial lips to apply the cream, she conceded only that the lips would have required separation only "just a little bit" to insert her finger to apply the cream. Giving plaintiff the benefit of every reasonable inference, and disregarding defendant's evidence to the contrary, we conclude that we cannot say that plaintiff has failed to create a prima facie case that the alleged failure to advise as to separation of the labial lips caused the adherence of the labial lips.

Dr. Weiss stated his opinion that if Dr. Gordon did not instruct Ms. Ladish concerning the separation of the labial lips, such failure was "below the standard of care."

Dr. Gordon and Dr. Calkins each also acknowledged that it is important to advise the patient to separate the lips frequently. Dr. Gordon believes that he did advise her to separate the lips, although he cannot specifically remember that he did. For purposes of determining whether she made a submissible case, we disregard evidence contrary to plaintiff's evidence.

■ Dr. Gordon contends that plaintiff failed to make a submissible case because Dr. Weiss never gave any description or definition of the meaning of the phrase "standard of care" used in his testimony. Under Missouri law, the term "negligence," as used in reference to health care providers, means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession. *Gridley v. Johnson,* 476 S.W.2d 475 (Mo.1972). The use of the terms "accepted medical standards" and "standards of care" do not in themselves satisfactorily articulate the appropriate legal standard. Care should be taken by counsel in every case, with every expert witness, to make sure the expert is properly oriented with regard to the meaning of the concept of negligence in the instance of a health care provider. It is not enough that the jury instruction [MAI 11.06] informs the jury of the meaning of negligence, or that some other witness testifies as to *that witness'* understanding of negligence in that context. It is necessary in each case that the fact finder be informed as to whether the witness, in offering opinions, is using the standard prescribed by law and not some other standard. *Dine v. Williams,* 830 S.W.2d 453, 456 (Mo.App.1992).

In this case, Dr. Weiss failed to specifically articulate the meaning of the term "standard of care" as he used it. On certain occasions in his testimony, he made such general criticisms as "it would have been more appropriate" to do something else, and that Dr. Gordon "exhibited rather poor judgment" in certain actions. In *Swope v. Printz,* 468 S.W.2d 34 (Mo.1971), an expert witness was asked, "Do you have an opinion of whether or not the operation as performed by Dr. Printz was up to acceptable medical standards as you know them?" The expert answered that the operation "was not up to acceptable medical standards." The court reversed plaintiff's verdict because it was not clear the expert was comparing defendant's performance with the objective legal standard of negligence. 468 S.W.2d at 40.

■ Plaintiff argues that *Pettet v. Bieterman,* 718 S.W.2d 188 (Mo.App.1986) relaxes the requirement that the legal standard be strictly articulated. In that case the plaintiff's expert testified as to "standard", "accepted," and "prescribed" medical practice. He did not testify whether defendant used that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession. Defendant's expert, in testifying for the defense, did articulate the legal standard. The court concluded that plaintiff's use of the terms "standard" and "accepted" and similar terms, when *combined with the testimony of defendant's expert,* gave the jury a proper context in which to evaluate the remarks of plaintiff's expert. The court affirmed a judgment for plaintiff. It is interesting that the court in that case did not mention *Swope v. Printz,* decided fifteen years earlier. We submit, however, that *Swope v. Printz,* the decision of our Supreme Court, is the applicable authority. *Swope* requires that the fact finder be informed of the standard being employed by plaintiff's experts in order for plaintiff to make a submissible case, unless the defendant's evidence amounts to a concession that the legal standard is the standard suggested by plaintiff.[4] It is not necessary that the legal standard be recited in ritualistic fashion, but generally it must appear somewhere in the context of the expert's testimony that the proper objective legal standard is the standard being employed by this expert in his or her testimony. Questions should not be propounded, or answered, in terms of "inadequately explored legal criteria" 1 McCormick, Evidence § 12, at 50–51 (4th ed. 1992). If attorneys and

---

4. The act of a defense expert in defining what he or she means by the term "negligence," or in otherwise setting forth the legal standard, is not the same as a concession by the defense expert that the alleged negligent act or omission did constitute a breach of the legal duty of care.

expert witnesses are allowed to become sloppy in the use of terms such as "accepted standards" and "standards of care" without specifying at some point in the witness' testimony the meaning of those terms, experts will inevitably tend to rely upon their own views of acceptable practice rather than applying the objective legal standard.

■ In this case, if Dr. Weiss had testified as to what he intended to convey by the use of the term "standard of care," and if he had indicated that by the use of that phrase he meant the use of that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession, there would be no question that Dr. Weiss' testimony adequately supported plaintiff's position on the issue of negligence. His use, however, of such phrases as "the usual approach," and "it might have been more appropriate" tend to show a casualness and vagueness in his approach to evaluating Dr. Gordon's performance. In this case, it is only because Dr. Gordon's *own evidence* acknowledged the importance of advising the patient about frequent separation of the labial lips that we hold that plaintiff established that there was a duty to advise plaintiff concerning the need for frequent separation of the labial lips. Even though Dr. Weiss' testimony was not in itself sufficient to establish defendant's duty, we will not find that plaintiff failed to establish defendant's duty, where defendant's evidence also acknowledges the existence of the duty. Consequently, we hold plaintiff established the existence of a duty to advise the patient to keep the labial lips separated during her recuperation.

■ This brings us to the matter of the trial court action in taking away plaintiff's verdict. This court has no authority to reinstate plaintiff's jury verdict of $75,000.00. The trial court, in addition to granting a judgment notwithstanding the verdict, also correctly determined that it had committed instructional error[5] requiring a new trial in the event any of plaintiff's claims were submissible. It would not be proper to give plaintiff a new trial on any allegations of negligence which were not supported by the evidence. Consequently, the only relief this court can give plaintiff is a new trial on the one allegation as to which we have found plaintiff presented a prima facie case of breach of duty—the failure to advise concerning separation of the labial lips.

■ The trial court, in granting the judgment notwithstanding the verdict, concluded there was no competent evidence to support a damage award for pain and suffering. Dr. Gordon argues the trial court was correct in this determination, due to the fact that discomfort and pain were necessarily a part of the procedures which plaintiff underwent, and it is problematic to separate out any pain related to particular actions. If we assume for purposes of argument that Dr. Gordon was negligent in failing to advise plaintiff to separate the labial lips, and if we further assume that as a result the labial lips began to adhere to one another in the five days following the laser surgery, then we conclude that it was necessary to separate the lips as a result of the failure to properly instruct plaintiff. Thus, it is possible to segregate the pain related to the failure to advise concerning the need to separate the labial lips. Plaintiff's damage is the pain or discomfort associated with separation of the labial lips.

No contention has been made that this is a case of "de minimis non curat lex." In view of plaintiff's description of her pain as being very extreme, we conclude that technically she is entitled to remand on this claim, although the claim may not be substantial. Accordingly, we remand for a new trial on the allegation of the failure to advise concerning the need to keep the labial lips separated. Plaintiff's additional issues on appeal are moot in view of this ruling.

*Conclusion*

Judgment for defendant is reversed. The case is remanded to the trial court for fur-

---

5. When several allegations of negligence are submitted in the disjunctive, there must be evidence to support the submission of each allegation. If there is any allegation not supported by substantial evidence, the giving of the instruction is error, and the only remedy is a new trial on any allegations which were supported by the evidence. Cf. *Brown v. Shawneetown Feed & Seed Co.*, 730 S.W.2d 587, 589 (Mo.App.1987).

ther proceedings. Plaintiff is barred from further prosecution of all claims except for the claim of the alleged negligent failure to advise plaintiff to keep the labial lips separated. Each party shall bear its own costs on appeal.

All concur.